UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Keisha Hodge,
Charles J. Taunt, Trustee,

    Plaintiffs,

v.                                       Case No. 11-cv-10597

                                        Honorable Sean F. Cox
PNC Bank,                            United States District Court Judge
Michael Bickers,
Carrie Valek,

    Defendants.
_____/

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOCKET
ENTRY NO. 73]**

Plaintiff Keisha Hodge ("Hodge"), who is an African American female, filed this civil action against her former employer, PNC Bank ("the Bank"), formerly known as National City, and her former supervisors, Carrie Valek ("Valek") and Michael Bickers ("Bickers") (together, "the Defendants"), alleging multiple federal and state discrimination claims under the Elliot Larsen Civil Rights Act ("ELCRA"), Title VII, and the Equal Pay Act.[1] Hodge also alleges a breach of an implied contract of employment claim against the Bank.

This matter is currently before the Court on Defendants' Motion for Summary Judgment [Docket Entry No. 73]. A motion hearing was held on May 23, 2013. For the reasons that follow, the Court shall **GRANT** Defendants' Motion for Summary Judgment [Docket Entry No. 73].

---

[1] Plaintiff Charles J. Taunt was added as the real party in interest in his capacity as trustee of Hodge's bankruptcy estate.

1

# BACKGROUND

On February 14, 2011, Hodge filed her Complaint, advancing the following claims: (1) Count I – Violation of Elliot Larson Civil Rights Act; Sex Discrimination and Race Discrimination as to PNC/National City, Michael Bickers and Carrie Valek; (2) Count II – Race and Sex Discrimination in Violation of Title VII (Disparate Treatment and Intentional Discrimination) as to PNC/National City; (3) Count III – Wrongful Discharge – Breach of Implied Contract and Legitimate Expectations as to National City; (4) Count IV – Retaliation in Violation of Elliot Larson Civil Rights Act (ELCRA) as to National City, Michael Bickers and Carrie Valek; (5) Count V – Retaliation in Violation of Title VII as to PNC/National City; and (6) Count VI –Violation of Equal Pay Act. (Docket Entry No. 1, at 6–15.)

On or around July 7, 2000, Hodge started working for the Bank as a retail management trainee. (Docket Entry No. 74, at 1; Hodge Dep. 10:20, April 30, 2010; Docket Entry No. 86, at 9.) After Hodge was transferred to the Bank's branch in Pontiac, Michigan, she was promoted to Branch Manager I on or around December 2002. (Docket Entry No. 74, at 2; Docket Entry No. 86, at 9.) On or around April 2003, Hodge was promoted to Branch Manager II. (Docket Entry No. 86, at 9.)

On or around "the lat[]er part of 2007," Hodge became part-owner/shareholder and vice president of Hodge and Associates, a commercial loan broker that is co-owned and operated by Hodge's husband, Tarik Hodge. (Hodge Dep. at 101–02, 105–06.)

The Bank's 2007 Employee Handbook states as follows:

> **Conflict of Interest**
> A 'conflict of interest' occurs when your private interest interferes or appears to interfere in any way with the interests of National City. You are expected to avoid all situations that might lead to a real or apparent material conflict between your self-interest and your duties and responsibilities as an employee, officer or director of

National City. Any position or interest, financial or otherwise, which could materially conflict with your performance as an employee, officer of director of National City, or which affects or could reasonably be expected to affect your independence or judgment concerning transactions between National City, its customers, suppliers or competitors or otherwise reflects negatively on National City would be considered a conflict of interest . . . .

**Corporate Opportunities**
Using confidential information about National City or its businesses, employees, officers, directors, customers or suppliers for personal benefit or disclosing such information to others outside your normal duties is prohibited . . . .

**Outside Business Relationships**
Before agreeing to act as a director, officer, consultant or advisor for any other business organization, you should notify your immediate manager.

Directors should disclose all new directorships or potential directorships to the Chairman of the Nominating and Board of Directors Governance Committee in order to avoid any conflicts of interest and to maintain independence . . . .

Employees who are considering outside employment should notify their manager or supervisor . . . .

Employees, officers and directors of National City are expected to follow this Code of Ethics at all times. Generally, there should be no waivers to this Code of Ethics; however, in rare circumstances conflicts may arise that necessitate waivers. Waivers will be determined on a case-by-case basis by the National City Human Resources Department with the advice of the National City Law Department . . . .

Known or suspected violations of this Code of Ethics will be investigated and may result in disciplinary action ***up to and including immediate termination of employment***.

(Docket Entry No. 74-3, at 21–23, 25.) (emphasis added).

With regard to whether Hodge was aware of and signed the Employee Handbook, Hodge testified that "[Valek] asked me about the employee handbook. I believe it's either code of conduct or code of ethics. I'm not sure. She asked me do I remember signing that, and I said 'Yeah.' I said, 'I don't remember it verbatim or I haven't memorized it,' I said, 'but I do remember it.'" (Hodge

Dep. 90:11–16.) Hodge testified that she did not remember disclosing her interest in Hodge and Associates to her immediate manager. (*Id.* at 139:9–13.) Hodge did not disclose her interest in Hodge and Associates to the Bank's Chairman of the Nominating Committee or the Board of Directors Governance Committee pursuant to the Employee Handbook. (*Id*. at 139:21–25.)

On or around June 2007, Hodge transferred to the Bank's branch in Birmingham, Michigan. (Docket Entry No. 86, at 9.) On or around August 2007, Hodge was promoted to vice president of the Birmingham branch. (*Id.* at 10.)

Sometime in July 2007, Hodge requested an 18% pay raise from her supervisor, Valek. (Hodge Dep. 55.) When asked how Hodge arrived at the 18% figure, she testified as follows:

> A     Because when I -- when I was on -- I was in my office, which used to be . . . Adam Clous' office, and I go to my computer to pull up a document that I had saved on that computer and then all of Adam's information comes up about his salary, his benefits, his tuition reimbursement, all of that, and I -- Adam was making approximately that percentage more than me, so.

(*Id*. at 55:24–56:5.) Hodge alleges that Cynthia Pearson ("Pearson"), an HR representative with the Bank, promised her a pay raise. (Docket Entry No. 86, at 10.)

On or around July 2007, Hodge had a meeting with Valek and Pearson to discuss a pay raise. (Hodge Dep. 68.) Hodge testified that, at that meeting, Valek told her that, after Valek researched other branch managers' salaries, Valek could not approve a pay raise for Hodge at that time. (*Id.* at 68:20–69:14.)

After Hodge's meeting with Valek and Pearson, Hodge had a meeting with Bickers in August or September 2007. (*Id.* at 71:1–5.) Hodge described that meeting as follows:

> A     When I walk in I said -- He said, 'How's Keisha today?' I said, 'I'm fine.' He said, 'How do we make you happy?' I said, 'Well, I'm pretty sure you know what's going on.' He said, 'Yes, I do. I received a call[] from Carrie.'

4

> And I said -- I said, 'Mike,' I said, 'I'm the type of person I like to do my job. I like to do it well. I like to go home. I don't like to be mixed up in anything,' I said, 'but this time I feel like I'm a victim of wage discrimination.' And that's when I went on to tell him the salary -- the salary discrepancy from me and Adam and went into it, and he said -- he responded with that's not really something that surprises him. He said if I knew what the managers made in Detroit, how much less they make in Detroit versus other locations then basically I wouldn't be saying anything. He said when he was the district sales executive in Detroit before he was promoted to market executive, if they did their job right, then he would try to bump up their salary a little bit more to make it comparable to what the other managers in other areas were making. He said, what really bothers him is Cynthia Pearson promising me a raise. He said, 'We have to have HR partners that we can trust.' He said, 'I don't know what you'll be getting right now, but you'll get something.'

(*Id.* at 71:8–72:6.) A few weeks after her meeting with Bickers, Hodge received a one-time bonus of $3,000. (*Id.* at 74:10–19.)

Sometime around April 9, 2008, the Bank received a complaint from one of its customers, Ruth Peppiatt, asserting that Tarik Hodge had allegedly mishandled her commercial loan application with Hodge and Associates. (Valek Decl., Docket Entry No. 74:12; Nichols' Decl., Docket Entry No. 74-13; Hodge Dep. 124.) Hodge referred Peppiatt to Hodge and Associates after the Bank denied her $300,000 commercial loan application. Hodge described the events leading up to Peppiatt's complaint as follows:

> A    Well, Miss Peppiatt came to my branch and she met with Ryan Sharrow. Ryan was a management trainee at the time. Met with him about getting financing for her business. She has some type of antique restoration business or something like that in Birmingham. She met with him about that. He referred her to me, because I knew how to better deal with the business customers than some of my staff did . . . . Well, the final answer was Miss Peppiattt needed to have 20 percent to put down to do a loan with us and a commercial loan with us, and it come from a - - she couldn't do a line of credit with us and then do a loan with us, because that means we're taking a hundred percent of the risk. Some of that had to come from her. Well, she didn't have 20 percent. I think she was trying to get $300,000, I think. She

> didn't have 20 percent of that. So then I was taught and trained when I worked under Jo, Jospehine Obasuyi, that if we can't help a customer you refer - - we refer them to somebody who can so that we can at least keep their deposit accounts. So I referred her - - and we used brokers before. I referred her to Tarik Hodge, who was my husband . . . .
>
> Q     Was she applying for one loan, a commercial loan and a line of credit?
>
> A     No. She needed on big loan, one commercial loan, but she needed the money to put down for the loan, wherever she got it from, and that's how the line of credit came into play, because she needed the money to put down on the loan, but the lending was coming from somewhere else when she was referred over to Tarik Hodge[, in his capacity as co-owner/operator of Hodge and Associates].
>
> Q     So she was looking to borrow through a line of credit with National City the down payment that she would need to be able to obtain the commercial loan?
>
> A     It gotten -- It had gotten to that point only because she couldn't get the commercial loan a hundred percent financed.
>
> Q     Okay. And then she inquired about whether she could actually get a line of credit also through National City to meet that 20 percent requirement.
>
> A     Tarik referred her back to me to do an application for a small business line of credit.

(Hodge Dep. 94–95, 97:23–98:16.)

The Bank conducted an investigation into Peppiatt's complaint, which was performed by Peggie Nichols ("Nichols"), a senior investigator with the Bank. (*Id.* at 140:9–14; Nichols Dep. 6, April 30, 2010.)

After the investigation concluded, Hodge attended a meeting on May 5, 2008, with Valek and Nichols to discuss Peppiatt's complaint, the Bank's Code of Ethics, and Nichols' findings during the investigation. (Hodge Dep. 89, 124–25.)

Hodge testified that she referred "[m]aybe three [customers,] including Peppiatt," to Hodge and Associates while she was employed with the Bank. (*Id.* at 126:1–4.) When asked about the type of customer that she referred, Hodge testified as follows:

> A     The customers that I referred, they were not declined by National City. They did not meet the guidelines to begin the process . . . .

(*Id.* at 125:3–5.)

Hodge and Associates charges a loan application fee of between $2,500 or $4,500. (*Id.* at 131:8–11.) Hodge testified that the Bank's customers that she referred to Hodge and Associates were not charged a fee. (*Id.* at 132, 135.) At the May 23, 2013, motion hearing, Hodge did not deny that Peppiatt paid a loan application fee to Hodge and Associates with monies secured through a line of credit provided by the Bank.

After the interview concluded, Hodge wrote and signed a statement, which reads as follows:

> On May 5, 2008, I returned to work from maternity leave and my DSE, Carrie Valek, reviewed the Code of Ethics with me. She brought it to my attention that I violated the Code of Ethics by referring [Peppiatt] and occassionally other business customers that were declined by [the Bank] to Hodge & Associates, which is owned by my husband, Tarik Hodge. I did not intentionally violate the Code of Ethics. I know that my record with [the Bank] will attest to the fact that I'm an upstanding employee and person. This violation was an oversight on my part which led to an unfortunate incident.

(Docket Entry No. 74-6, at 36.) Hodge was discharged from her employment with the Bank on March 5, 2008. (Docket Entry No. 86, at 11.)

During her deposition, Hodge did not dispute that the reason that she was given by Valek for her termination from her employment with the Bank was because she referred Peppiatt to Hodge and Associates. (Hodge Dep. 126–128.)

Thereafter, on October 26, 2012, the Defendants filed the Motion for Summary Judgment. (Docket Entry No. 73.)

## STANDARD OF REVIEW

Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The Court views the

7

record in the light most favorable to the nonmoving party and all reasonable inferences are drawn in favor of that party. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). "When the non-moving party fails to make a sufficient showing of an essential element of his [or her] case on which he [or she] bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2458, 91 L.Ed. 2d 265 (1986)). "The judge does not weigh the evidence and determine the truth of the matter but determines whether there is a genuine issue for trial." *Blackmore*, 390 F.3d at 895 (internal quotations omitted).

## ANALYSIS

Defendants' Motion for Summary Judgment asserts that the Defendants are entitled to judgment as a matter of law because no genuine issue of material fact exists with regard to Hodge's (1) breach of implied employment contract claim (Count III); (2) Equal Pay Act claim (Count VI); (3) claims of discrimination in violation of Title VII and the ELCRA (Counts I & II); (4) claims of retaliation in violation of Title VII and the ELCRA (Counts IV and V); and (5) pattern-or-practice of discrimination claim (Count I). (Docket Entry No. 73, at 20–30.)

**A.  Breach of an Implied Employment Contract Claim (Count III).**

In Count III, Hodge asserts a breach of contract claim. (Docket Entry No. 1, at 10–11.) Hodge alleges that the Bank's Employee Handbook, as well as the Bank's custom and history of progressive discipline and Hodge's education loan contract with the Bank, created an implied "just cause" employment contract between herself and the Bank. (*Id.*; Docket Entry No. 86, at 17–21.) The Defendants assert that this claim fails because (1) Hodge has acknowledged that she is an at-will

8

employee and (2) even if Hodge could establish that she is not an at-will employee, there is no genuine issue of material fact that the Bank fired her for cause. (Docket Entry No. 73, at 29–30.)

The Court agrees. Even if the Employee Handbook did create an implied contract of employment, the Bank has established just-cause for Hodge's discharge based on her admitted violation of the Bank's Code of Ethics.

**B.     The Equal Pay Act Claim (Count VI).**

With respect to Count VI, the Defendants contend that Hodge cannot establish a *prima facie* case and that, even if she could, she cannot overcome that a factor other than her gender led to any alleged pay disparity. (*Id.* at 25–28.)

**1.     *Prima Facie* Case.**

Among other things, Hodge argues that Clous, as well as several other Caucasian employees, were paid more than her for equal work performed under similar working conditions, contrary to the Equal Pay Act. (Docket Entry No. 86, at 23–26.)

The Equal Pay Act ("EPA") prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work. 29 U.S.C. § 206(d)(1). "To prove an employer has violated the Equal Pay Act, a plaintiff must show that the employer paid an employee of the opposite sex different wages 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 881 (6th Cir. 2013) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). "'Equal work' does not require the jobs to be identical." *Id.* (citing *Beck-Wilson v. Principi*, 441 F.3d 353, 359-60 (6th Cir. 2006)). As to the work portion of that analysis, the "focus at the *prima facie* stage is on actual job requirements and duties, rather

than job classifications or titles." *Vehar v. Cole Nat'l Grp., Inc.*, 151 Fed. App'x 993, 999, 2007 WL 3129713 (6th Cir. 2007).

In their motion for summary judgment, the Defendants apply the "similarly situated, non-protected employee" element used in Title VII discrimination claims to their Equal Pay Act analysis. (Docket Entry No. 73, at 26.) This is not the correct standard. The focus in Equal Pay Act claims is on the actual job requirements and duties. Neither party disputes that Hodge was transferred to the Birmingham branch to assume many of Clous' responsibilities and duties regarding the management of the day-to-day operation of that branch in his capacity as vice president. Weighing the facts presented in the light most favorable to the plaintiff, a genuine issue of material fact exists as to whether Hodge has established a *prima facie* case of wage discrimination under the Equal Pay Act with regard to her alleged comparable, Clous. However, because Hodge offers no evidence regarding the other Caucasian employees' actual job requirements and duties or whether or not they are in any way comparable to her, the Court holds that Hodge cannot establish her *prima facie* case of wage discrimination based on those individuals. (Docket Entry Nos. 86, at 26; Docket Entry Nos. 87-14, 87-15, 91; Valek Dep. 60–61, 67, 71, 76.) Accordingly, a genuine issue of material fact exists only with regard to whether Hodge can establish a *prima facie* case of wage discrimination under the Equal Pay Act with regard to her alleged comparable, Clous.

    **2.**     **Affirmative Defenses.**

"Once a plaintiff has proven her *prima facie* case, the burden shifts back to the defendant to provide one of four affirmative defenses: '(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.'" *Warf*, 713 F.3d at 881 (quoting *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th

Cir. 1998)). "Because these nongender-based explanations for the wage differential are affirmative defenses, the defendant bears the burden of proof." *Buntin*, 134 F.3d at 799. This means that in order to survive a defendant's motion seeking judgment as a matter of law, an "EPA plaintiff need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual." *Id*. "As the party who bears the burden of persuasion, the defendant who makes a motion under Rule 50(a) must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." *Id*. In other words, granting judgment in favor of the defendant employer is "proper 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'" *Id.* (citing *EEOC v. State of Delaware Dep't of Health and Soc. Servs.,* 865 F.2d 1408, 1414 (3d Cir. 1989)).

"A wage differential based on education or experience is a factor other than sex for purposes of the Equal Pay Act." *Balmer v. HCA, Inc*., 423 F.3d 606, 612 (6th Cir. 2005); *see also Ambrose v. Summit Polymers*, *Inc*., 172 F. App'x 103, 107 (6th Cir. 2006). Here, the evidence presented establishes that Clous' and Hodge's respective work experience and education differ. Significantly, prior to being hired by the Bank in April 2003, Clous had around eight years of banking experience, including two years of being a branch manager. (Docket Entry No. 73, at 27; Docket Entry No. 75, at 1–3; 26–30.) Shortly after being hired by the Bank, Clous earned his Masters of Business Administration degree in 2004. (Docket Entry No. 75, at 30.) At the time of hire in July 2000, Hodge started out in the retail management trainee out of college. (Hodge Dep. 9–11, 18–19.) Hodge does not dispute that she had no banking experience at the time of her hire. At that time, she held a Bachelor's of Business Administration. (*Id.* at 9.) Hodge eventually started her Master of Art in Organizational Management program in 2005. (*Id*.) By the time Hodge's wage disparity claim

arose in June or July 2007, Hodge had around seven years of experience in Banking, while Clous had around 11 years of experience. Accordingly, the Court finds that no genuine issue of material fact exists as to whether the Defendants have satisfied its burden of establishing an affirmative defense under the Equal Pay Act. There is no evidence suggesting that Hodge's alleged pay disparity, when compared with Clous or the other male Caucasian employees, was based on anything besides their respective education and prior work experience. As such, summary judgment is appropriate on Hodge's Equal Pay Act claim.

**C.	Discrimination Claims Based on Race and Gender Under Title VII and the ELCRA (Counts I & II).**

In their Motion for Summary Judgment, the Defendants challenge whether Hodge can establish her *prima facie* case of wage discrimination and whether Hodge can show that her termination was pretext for discrimination. (Docket Entry No. 73, at 21–24, 28.)

**1.	*Prima Facie* Case–Wage Discrimination.**

The Defendants argue that Hodge cannot establish her wage discrimination claims because she cannot establish that she was treated differently than similarly situated, non-protected employees. (Docket Entry No. 73, at 28.) Hodge contends that she has sufficiently alleged a *prima facie* case of wage discrimination under Title VII and the ELCRA based on the arguments that she advanced in support of her Equal Pay Act claim. (Docket Entry No. 86, at 26–27.)

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on her discrimination claims. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Here, Hodge relies on circumstantial evidence for her sex and race based employment discrimination claims.

Under the circumstantial evidence approach, a plaintiff must show the existence of facts that create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). The *McDonnell Douglas* framework is applied to Hodge's race and sex discrimination claims under Title VII and the ELCRA. *See In re Rodriquez*, 487 F.3d 1001, 1007–08 (6th Cir. 2007) ("Michigan courts utilize the federal McDonnell Douglas burden-shifting framework for evaluating discrimination claims founded upon circumstantial evidence.").

To establish a *prima facie* case of race and gender discrimination, a plaintiff must establish that: (1) she is a member of the protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated, non-protected employees. *Owhor v. St. John Health-Providence Hosp.*, 503 F. App'x 307, 310–11, 2012 WL 5259145 (6th Cir. 2012) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)).

Hodge must demonstrate that she was similarly situated to her comparator, but treated differently with regard to salary. *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 456 (6th Cir. 2004). To be similarly situated, Hodge must show that her "comparables are similarly situated in all respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Hodge must prove that "all of the relevant aspects of [her] employment situation were nearly identical to those of [another's] employment situation," including such things as work experience. *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 699–700, 568 N.W.2d 64 (1997); *see also Ledbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) ("Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated."); *Terwilliger v. GMRI, Inc.*, 952 F. Supp.

13

1224, 1229 (E.D. Mich. 1997).

Unlike the Equal Pay Act, Title VII and the ECLRA require Hodge to show that work experience was not a basis for wage disparity in her *prima facie* case rather than placing the burden on Defendants to raise differences in work experience as an affirmative defense. *Mallison v. Hawarth, Inc.*, No. 1:09-cv-1133, 2011 WL 130246 at *7–8 (W.D. Mich. Jan. 14, 2009). Hodge offers no arguments particular to her Tile VII or ELCRA claims, instead she relies on the arguments advanced in support of her Equal Pay Act claim. (Docket Entry No. 86, at 26–27.) Accordingly, for the same reasons that Hodge failed to refute Defendants' affirmative defense to her Equal Pay Act claim, Hodge also fails in her *prima facie* case of wage discrimination under Title VII and the ELCRA. Hodge cannot show that her wage disparity was not based on major differences in education and experience.

### 2. Pretext for Discrimination–Wrongful Termination.

Even if Hodge could establish a *prima facie* case, the Defendants also assert that she cannot establish that their legitimate business reasons for her termination is a pretext for discrimination. (Docket Entry No. 73, at 20–24.)

Once a plaintiff has established a *prima facie* case of discrimination on the basis of race and sex, the Defendants must articulate a legitimate non-discriminatory reason for treating a non-protected employee differently. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585–86 (6th Cir. 2009). "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Id.*; *see also Bd. of Tr. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) ("the employer's burden is satisfied if he simply 'explains what he has done' or 'produces evidence of legitimate nondiscriminatory reasons'").

14

After the Defendants articulate a legitimate, non-discriminatory reason, the burden shifts to Hodge to show that the Defendants' stated reason is not the real reason for its employment action, but a pretext for discrimination. To discredit the Bank's legitimate, non-discrimination reason for her termination, Hodge must show "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate . . . [her] discharge; or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir. 1994); *Reid v. Mich. Dep't Of Corr.*, 101 F. App'x 116, 120–21, 2004 WL 1367272, at *3–4 (6th Cir. 2004); *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007). Hodge must produce "sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that the [D]efendants intentionally discriminated against [her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

Hodge has not provided any evidence to show that a genuine issue of material fact exists as to whether the Bank's legitimate, non-discriminatory reason for discharging Hodge is actually a pretext for discrimination under Title VII or the ELCRA. The Bank's Code of Ethics specifically state: "Known or suspected violations of this Code of Ethics will be investigated and may result in disciplinary action *up to and including immediate termination of employment*." (Docket Entry No. 74-3, at 25.) Hodge admits to violating the Code of Ethics by referring Peppiatt, and, at least, two other customers to her loan brokerage company. The Bank has produced evidence that Hodge's interest conflicted with her employment with the Bank by the facts that Hodge likely profited from Peppiatt's referral, as a co-owner of Hodge and Associates, and Peppiatt later filed a complaint with the Bank. Hodge offers no evidence, besides Hodge's allegations in her deposition testimony and affidavit, that any Bank employee referred business to Hodge and Associates or that the Bank waived

15

its conflict of interest policy. (Docket Entry No. 86, at 13.) Accordingly, summary judgment is appropriate with regard to Hodge's discrimination claims based on race and gender under Title VII and the ELCRA.

D.      The Retaliation Claims under Title VII and the ELCRA (Counts IV & V).

　　　　1.      *Prima Facie* Case.

The Defendants assert that Hodge cannot establish a *prima facie* case of retaliation because she cannot establish a "causal connection" between her alleged protected activity and her subsequent discharge. (Docket Entry No. 73, at 24–25.) Hodge asserts that (1) Valek and Bickers terminated her because she complained to them about the disparity in pay between herself and Clous; (2) the temporal proximity of her protected activity and subsequent discharge establishes her *prima facie* case; and (3) the Defendants also retaliated against Hodge when they filed a civil suit for the return of the education loans that the Bank advanced her. (Docket Entry No. 86, at 21–23.)

Claims of retaliation in violation of ELCRA receive the same analysis as those brought under Title VII. *See Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285, 2004 WL 784117, at *8 (6th Cir. April 5, 2004); *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 472 Mich. 263, 273, 696 N.W.2d 646, 653 (2005). To establish a *prima facie* case of retaliation under Title VII and the ELCRA, a plaintiff must prove by a preponderance of the evidence: (1) plaintiff engaged in a protected activity; (2) plaintiff's engagement in the protected activity was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *DiCarlo*, 358 F.3d at 420; *Cantita v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir.1990); *Garg*, 472 Mich. at 273, 696 N.W.2d at 653. "The burden of proof at the *prima facie* stage is minimal; all

the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007).

"One way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013). Evidence of retaliatory conduct is required if the temporal proximity between the protected activity and the adverse employment action is not "very close." *Id.* (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The Sixth Circuit has "typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *Dixon*, 481 F.3d at 334. Likewise, Michigan courts are generally in accord with the Sixth Circuit's standard; however, they generally consider temporal proximity as a factor in establishing a *prima facie* case. *See O'Leary v. Charter Twp. of Flint*, No. 295078, 2011 WL 1376306, at * 3 (Mich. App. April 12, 2011); *Ford v. City of Dearborn*, No. 293040, 2010 WL 4137518, at * 7–8 (Mich. App. Oct. 21, 2010) (holding that temporal proximity is not necessarily a dispositive in establishing the causal connection element); *Rymal v. Baergen*, 262 Mich. App. 274, 314, 686 N.W.2d 241, 263 (2004) (holding that two months was enough to establish close temporal proximity where there was an ongoing pattern of abuse during that time); *Cox v. Elec. Data Sys. Corp.*, 751 F. Supp. 680, 695 (E.D. Mich. 1990).

Hodge asserts that the Defendants first learned of the protected activity around June or July 2007. (Docket Entry No. 86, at 22.) At the May 23, 2013, motion hearing, the Defendants assert that they first learned of the protected activity on or around June 2007. On or around April 9, 2008, the Bank received the complaint from Ruth Peppiatt. (Docket Entry Nos. 74-12, 74-13; Docket

17

Entry No. 74-2, at 34–35, 37–38.) Hodge was terminated on May 5, 2008. (Docket Entry No. 86, at 11.) The date of the protected activity and the date of Hodge's termination or Peppiatt's complaint do not evidence close temporal proximity. Likewise, the date of the filing of the civil action involving the education loans, after Hodge was fired, does not evidence close temporal proximity to the date of her protected activity. There is no evidence that the Bank was on notice of Hodge's violation of the Bank's Code of Ethics prior to Peppiatt's complaint. Likewise, Hodge has not offered any evidence of retaliatory conduct or that Defendants also retaliated against Hodge when they filed a civil suit against Hodge for the return of the education loans after Hodge was terminated. Accordingly, summary judgment is appropriate with regard to Hodge's *prima facie* case of retaliation.

### 2. Pretext for Retaliation.

Assuming that Hodge can establish her *prima facie* case, the Defendants also contend that Hodge cannot establish that her termination was pretext for retaliation. (Docket Entry No. 73, at 21–24.)

If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate some legitimate, non-discriminatory reasons for its actions. *Cantita*, 903 F.2d at 1066 (internal citations and quotations omitted). Thereafter, the plaintiff must demonstrate that the proffered reasons are merely pretext for retaliation. *Id.*

Hodge provides the same arguments that she advanced in support of her *prima facie* case of retaliation. There is no evidence showing that a genuine issue of material fact exists with regard to whether Hodge's termination was pretext for retaliation. Accordingly, the Court holds that no genuine issue of material fact exists with regard to whether the Bank's proffered reason for

terminating Hodge was merely pretext for retaliation.

E.     The Pattern-or-Practice Claims.

Hodge makes "pattern-or-practice" claims of discrimination in Count I of her Complaint under the ELCRA. (Docket Entry No. 1, at 4, 6.) Generally, pattern-or-practice claims of discrimination are brought under Title VII and not available to individual defendants. *See Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004). Under Title VII, Hodge is required to prove that wage discrimination was "standard operating procedure" at the Bank. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 419 (6th Cir. 1999).

Regardless if Hodge brings this claim under the ELCRA or Title VII, she has offered no evidence suggesting that discrimination is standard operating procedure at the Bank or that the Bank had a policy or practice of discriminating against a protected class of employees. *See id.*; *Davidson v. Allsteel, Inc.*, No. 09-11308, 2011 WL 717524, at * 14 (E.D. Mich. Feb. 22, 2011). Accordingly, the Court grants summary judgment with regard to Hodge's pattern-or-practice claims.

## CONCLUSION AND ORDER

For the aforementioned reasons, **IT IS ORDERED** that Defendants' Motion for Summary Judgment [Docket Entry No. 73] is **GRANTED**.

**IT IS SO ORDERED**.

                                S/Sean F. Cox
                                Sean F. Cox
                                United States District Judge

Dated: June 6, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on

June 6, 2013, by electronic and/or ordinary mail.

                                              S/Jennifer McCoy
                                              Case Manager